# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of

DONNA M. COCHENER (f/k/a DONNA COCHENER-METCALFE),

    Respondent/Cross Appellant,

and

CHRISTIAN T. METCALFE,

    Appellant/Cross Respondent.

No. 83271-9-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — Donna Cochener and Christian Metcalfe filed cross petitions to modify the parenting plan for their two children, each seeking sole decision-making for the children's educational and health care needs. The trial court generally granted sole decision-making to Cochener, including for educational and medical decisions. Metcalfe appeals, asserting several errors. We affirm the trial court's grant of sole decision-making to Cochener among other rulings, we reverse in part, and we remand as further described below.

I

Donna Cochener and Christian Metcalfe were previously married. Together they share two sons, L. and E. Both children have complex special medical and educational needs. Cochener and Metcalfe's original parenting plan was entered in 2016 and directed joint decision-making. In March 2020, both parties filed petitions to change the parenting plan, each arguing they should be granted sole

decision-making authority. The cross petitions were presented over a six day trial from June 28 to July 9, 2021.

Metcalfe argued, generally, that Cochener was resistant to acknowledging and had downplayed the extent of the special needs and mental health issues of the children, did not advocate for the children, and did not cooperate with Metcalfe in decision-making. Cochener argued, generally, that Metcalfe engaged in excessive conflict, made unreasonable demands of providers, and distorted information between the parties and providers. Eighteen witnesses testified at trial. Metcalfe called among others experts Wendy Marlowe, PhD, whom Metcalfe hired to conduct a records review and prepare a report, and Theodore Mandelkorn, MD, a behavioral medicine physician who had treated L.

Metcalfe also called Jennifer Wheeler, PhD, who served as a court-appointed parenting evaluator. Dr. Wheeler was appointed as an agreed, court appointed expert and provided a report and testimony concerning her evaluation of the parents' respective parenting skills and their interactions with medical and educational providers. Among other things, Dr. Wheeler based her report on interviews with Metcalfe and Cochener, as well as 18 third party professionals familiar with L.'s and E.'s educational and health needs. Dr. Wheeler reviewed L.'s and E.'s educational and health care records. Without objection, the trial court admitted Dr. Wheeler's report and notes from her interviews with the various witnesses. Dr. Wheeler recommended the court implement sole decision-making, suggesting that Metcalfe be responsible for health care decision-making and that Cochener be responsible for educational decision-making.

The trial court found joint decision-making was no longer feasible and "splitting decision-making" was not appropriate because "education and healthcare decisions for these children are so intertwined as to be inseparable." This finding is unchallenged and is accepted as true on appeal. In re Marriage of Magnuson, 141 Wn. App. 347, 351, 170 P.3d 65 (2007). After granting a motion for reconsideration in part which clarified the language of several provisions, the trial court entered the amended final order and findings on petition to change a parenting plan, and the amended parenting plan granting sole decision-making authority to Cochener in all areas except religious upbringing.

II

We address first Metcalfe's challenge to the trial court's granting Cochener sole decision-making authority. Metcalfe assigns error to several findings of fact, and the trial court's legal conclusions flowing from them. Metcalfe argues the trial court "abused its discretion by ordering sole decisionmaking to [Cochener] for all decisions except religious upbringing." Metcalfe assigns error to the trial court's decisions that Cochener may make any major decision 14 days after notifying Metcalfe, that Cochener may schedule all of the children's appointments, and that the parenting plan is in the best interests of the children. Metcalfe further argues the trial court abused its discretion by finding any harm caused to the children by changes to the parenting plan is outweighed by the benefits.

A

We first consider Metcalfe's challenges to certain findings of fact. "The trial court's findings of fact will be accepted as verities by the reviewing court so long

as they are supported by substantial evidence." In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." Id.

1

Metcalfe challenges portions of finding 17, among them, that Metcalfe's "reaction to tutor Eliza Furmansky's request for [L.] not to use a calculator on certain worksheets was outrageous. [L.] experienced discomfort as a result."

In November 2019, Metcalfe came into conflict with Eliza Furmansky, L.'s tutor since 2016. Furmansky had instructed L. to complete a times table work sheet without the aid of a calculator. Metcalfe sent an e-mail that stated L.'s IEP (individualized education program) allowed use of a calculator in all school settings, and that he would be "honoring that accommodation." Furmansky explained her rationale regarding calculator use for this exercise. Metcalfe responded, "I understand your opinion, but you misunderstand your role with my and [Cochener's] son. You are not the decision maker. If you'll neither honor [L.]'s legal rights under his IEP or my co-equal decision making authority as his parent, I wonder if you want to continue working with [L.]?" In the final e-mail on the subject, Metcalfe said, "I also suspect that per Title III of the ADA / ADAAA[1] that your business can not legally deny this reasonable accommodation to my son— and that to do so would constitute discrimination." "So to be clear if you are to continue to work with [L.] you need to follow the IEP and allow him to use a calculator—even for simple math. If you can't follow that guideline then I do not

---

[1] Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 37.

believe you should continue to work with [L.]. If you still object ask yourself if [Cochener] would succeed at getting a judge/arbitrator to go against [L.]'s Dep[artment] of Education / Federally backed IEP. (I'd think that highly unlikely)." Metcalfe took L.'s binder and attached "not one, but two calculators as well as taping over [Furmansky's directions]." Furmansky testified, "[I]t felt like he was trying to get [L.] to start a fight with me." Furmansky described Metcalfe's e-mails as "condescending, patronizing, threatening, hurtful, . . . and . . . ridiculous." While Furmansky continued to work with L. after the conflict with Metcalfe, she "would not attempt to ask for him to support [L.] in specific ways at home again . . . because that would cause more trouble than be a support."

Metcalfe's e-mail communications with Furmansky and Furmansky's testimony are substantial evidence supporting the trial court's finding that his reaction was "outrageous." As a result of the conflicting instructions, L. "expressed some embarrassment and sadness" when Furmansky began to erase answers that had been completed with a calculator. This is substantial evidence supporting the finding that L. experienced discomfort. This challenged aspect of finding of fact 17 is supported by substantial evidence.

2

Metcalfe challenges the portion of finding of fact 17 stating Metcalfe's "interpersonal communication has alienated important people in [L.] and [E.]'s lives."

Evidence showed that in fall 2018, Metcalfe abruptly and unilaterally terminated L.'s ABA therapy services with Magnolia Behavioral Therapy (MBT)

5

because he disagreed with changes to how L.'s behavior was tracked day to day. When he learned of the change, Metcalfe requested a "pros and cons of this approach," and stated that if he was "not comfortable with the risks," "I plan to withdraw my consent for [L.] to receive services from MBT." Metcalfe later responded, "Whether well intentioned or not I believe your actions and approach to be flawed and not in the best long term interests of my son. . . . Please be advised that as of end of day tomorrow, Fri 10/26, I withdraw my consent for you, your firm and your providers to work with my son, [L.]." When MBT outlined the discharge process, Metcalfe responded, "No need to complete the discharge steps and after today MBT does not have my consent to discuss [L.] with anyone after today. To be clear your firm and [L.'s therapist] were terminated because of her very poor actions. This is not a mutual parting of ways. I ask for less and not more additional actions by [MBT] so please clear out today." Cochener testified L. was "very upset to not say goodbye to [his therapist] and had some . . . outbursts over it and some crying over it." Dana Doering, Guardian Ad Litem (GAL) for both children, affirmed that after Metcalfe's decision to terminate MBT's services, L. was without ABA therapy for several months while the parties were in a dispute about choosing a new therapist.

Carla Hershman, L.'s mental health therapist, reported to Dr. Wheeler, " 'It appeared to me that his dad is highly sensitive. . . it felt as though any wrong word from me would potentially end the relationship. . . [L.] has not had the chance to build long-term relationships with providers, with some exceptions, because dad finds reasons that people are not good enough, and pulls him.' "

6

Metcalfe filed complaints against six providers. Metcalfe argues this is a limited number out of the total number of service providers. Metcalfe assembled a list of 57 providers by reviewing insurance claims. The list included providers who had never interacted with the children. The providers Metcalfe filed complaints against were closely involved with the children, including E.'s daycare, L.'s behavioral therapist, and the school both children attended for years. As discussed in section II.A.4. below, multiple providers testified that Metcalfe's manner of interaction negatively impacted their relationships with Metcalfe and affected the quality of services they were able to provide. There is substantial evidence to support the finding that Metcalfe alienated important people in the children's lives.

3

Metcalfe challenges the portion of finding of fact 17 stating "that [Metcalfe] engaged in 'poor behaviors and actions.' " The trial court's sentence reads in full: "Intent cannot be an excuse for poor behaviors and actions; particularly when the result negatively impacts [L.] and [E.]."

In January 2019, when Metcalfe felt a teacher was not providing the level of detail he wanted in a conversation, Metcalfe made a formal request for an in-person meeting, in accordance with the Spruce Street School's grievance policy. The school asked Metcalfe to clarify what his grievance was. Metcalfe responded with a lengthy e-mail further challenging the school's response to his initial complaint. Throughout the exchange, Metcalfe's e-mails were lengthy and repetitive.

In May 2019, Metcalfe requested Spruce Street implement a specific behavior log for L. Metcalfe said he was requesting the log "not because he's having significant difficulty right now, but rather to better support his success." When teachers stated that they did not think a behavior log was needed for L., Metcalfe responded, in part, "[I]f Spruce Street School is unwilling to workout [sic] a compromise to better support [L.] this year it makes me question its ability and willingness to support him next year." On May 10, 2019, Metcalfe asked Dr. Mandelkorn to provide a doctor's note recommending the specific daily feedback system for L. Dr. Mandelkorn provided such a note. The note stated L. "has been diagnosed to have Autism Spectrum Disorder and Attention Deficit Disorder." L. had not been formally diagnosed with autism at that time, and Dr. Mandelkorn testified he is not an expert in autism or special education. At a meeting on May 17, 2019, Metcalfe presented Spruce Street with Dr. Mandelkorn's letter. Cochener was not advised of the meeting beforehand, and Metcalfe did not send her a copy of the letter until after the meeting.

In June 2019, L. was formally diagnosed with autism spectrum disorder. Cochener and Metcalfe agreed to refrain from telling L. about his diagnosis until they could collaborate on how to discuss it with him. Metcalfe did not honor this agreement, and instead informed Cochener by e-mail in late August 2019 that he had shared L.'s diagnosis with him. Cochener reported this information was a source of distress for L., and that " '[i]t was hurtful to [her] that [she] wasn't allowed to be part of that conversation… it limited my ability to talk about his autism with [L.] for a while." (Some alterations in original.)

8

The GAL recommended the parties delay sharing the report of Metcalfe's retained litigation expert, Dr. Marlowe, with Seattle Public Schools as part of the formulation of an IEP for L. Metcalfe ignored this recommendation and sent Dr. Marlowe's report to Seattle Public Schools. Doering stated it was not reasonable to put this report into the IEP process, "or to have a non-neutral report that was conflicted between parents confound what was supposed to have been a very collaborative process."

Dr. Wheeler testified Metcalfe "has a very logical, rational basis for every one of his efforts to get a third party involved to resolve these disputes or dilemma. . . . [W]hat he misses . . . or fails to adequately . . . take into account is the collective impact each of those individual efforts both on people's impressions of him as . . . being this high conflict person, but also the impact it has on individuals." Dr. Wheeler stated Metcalfe's conduct is experienced by others as "overwhelming and frustrating and intense and overcommunicating," and that this negatively impacts the children.

There is substantial evidence supporting the trial court's finding that Metcalfe engaged in behaviors and actions that negatively affected the children, and were appropriately characterized as "poor" in that respect.

4

Metcalfe challenges the portion of trial court's finding 13 that states Cochener has "*less* deficits than [Metcalfe] in the area of interpersonal communication." (Boldface omitted.)

Dr. Wheeler's report indicated Cochener had difficulty seeing merit in Metcalfe's perspective because of her perception of his fomenting conflict. This led to Cochener "contribut[ing] to their ongoing high-conflict dynamic." Furmansky testified Cochener had "positive and really good, clear communication." Dr. Wheeler testified Cochener was not resistant to accepting any diagnoses of the children from medical professionals, and none of the professionals Dr. Wheeler spoke to had concerns about Cochener's decision-making in medical or educational issues for the children.

The GAL testified that Metcalfe revisited the same issues repeatedly, while Cochener rarely did.

Karen Brady, Executive Director of Ryther, which provided ABA services to L., was reported by Dr. Wheeler as stating, " 'The amount of contact I have had with [Metcalfe] is extraordinary… the number of phone calls and emails and meetings I have had with him is extraordinary. It is unlike any other interaction I have had in this job.' " (Alteration in original.) Brady stated Ryther had to implement a communication plan under which Metcalfe was allowed to e-mail only once per week because " '[h]e had a pattern of emailing a variety of people and asking for different things… it was hard to manage that.' " (Second alteration in original.) Brady stated Metcalfe " 'was okay with [a therapist] working with his son when he knew she didn't have a certification,' " but then " 'filed a complaint with [the Department of Health].' " After not receiving the outcome he sought in a meeting, Metcalfe responded, " 'I am so sorry I have to do this, but I have to file a complaint.' " Brady described Metcalfe as "extraordinary in terms of the amount of

time and demands he has," stating he stood out as "noteworthy" and "singular" in Brady's "28 years of being at Ryther." A teacher at L.'s school similarly described communicating with Metcalfe about days when L. lacked one-to-one support as "unique in my 26 years of teaching" for "how belligerent and persistent" Metcalfe could be.

Briel Schmitz, head of Spruce Street School, testified, "[Cochener] has been clear. I've never had any miscommunication." When asked about communication with Metcalfe, Schmitz said, "[O]ver time, . . . the dynamic . . . changed from the school leading the conversation and providing . . . our expertise to [Metcalfe] never being satisfied, . . . wanting to tell us how to do our work, not respecting our opinions . . . it became very challenging to work together." Spruce Street required a parent communication plan be put in place in order to allow L. to continue attendance. A court later ordered a parent communication plan to facilitate E.'s attendance as well. Schmitz said, "I feel like I was emotionally abused in this situation and taken advantage of." Schmitz said, "I've worked with a lot of kids who have different challenges and needs and this is, by far, the most extreme, the most difficult."

This testimony, as well as the evidence noted above, is substantial evidence supporting the trial court's finding that between the two parents, communication deficits manifested to a lesser extent with Cochener than with Metcalfe.

5

Metcalfe argues substantial evidence does not support a portion of the trial court's finding 10, which states, "Mother and Father have drawn other people and

11

their children into their conflicts, such as when Father tried to persuade Spruce Street volunteers and staff to rescind Mother's nomination to the board of directors."

In April 2019, Metcalfe contacted Spruce Street to discuss his conflict with Cochener concerning an incident that occurred at E.'s daycare in May 2018. The incident was before E. started at Spruce Street, in August 2018. Cochener served on the board of the school. Citing the conflict, Metcalfe made three requests of Spruce Street, including (1) that Cochener be precluded from serving on the compensation or governance committees or as President so long as either of the children are enrolled, (2) to "make the current and future President of the Board aware of this situation," (3) that administrators "work to maintain a strong working relationship with both [Cochener] and me and . . . be willing to offer unvarnished feedback to either or both of us that would benefit our children." On April 30, 2019, Metcalfe stated in an e-mail to Spruce Street staff: "Because of [Cochener]'s last actions and if her role and power are likely to grow at spruce street school [sic], especially if she were to have a say regarding [Schmitz's] salary, I'm not sure I'll be comfortable having either or both of my kids continue to be students there. (Regarding which I have joint decision making authority)."

This evidence demonstrates Metcalfe requested Cochener's role on the board be limited, but it does not evidence precisely an attempt to have her nomination rescinded. To that extent, the finding regarding Cochener's position on the Spruce Street board is not supported by substantial evidence precisely as drafted. However, there is substantial evidence that the parents drew others into

their conflict. Dr. Wheeler identified both parents' interactions with providers as contributing to a "high-conflict dynamic." Metcalfe met with Spruce Street to discuss an incident that did not occur there. Metcalfe asked Spruce Street to limit Cochener's role on its board. Finding of fact 10 is therefore supported by substantial evidence, except to the extent it finds Metcalfe sought specifically to have Cochener's nomination to the board rescinded.

B

We turn next to the trial court's grant of sole decision-making to Cochener, the findings that doing so is in the best interest of the children and any harm is outweighed by the benefits, and the court's decision to impose provisions allowing Cochener to make major decisions 14 days after inviting Metcalfe's input, and to schedule the children's appointments.

RCW 26.09.187(2)(b)(ii) states, "The court shall order sole decision-making to one parent when it finds that . . . [b]oth parents are opposed to mutual decision making." A trial court's decision to modify a parenting plan is reviewed for abuse of discretion. In re Marriage of Zigler, 154 Wn. App. 803, 808, 226 P.3d 202 (2010). A trial court's decision will not be reversed unless the court's reasons are untenable. In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard." In re Marriage of Fiorito, 112 Wn. App. 657, 664, 50 P.3d 298 (2002). "A trial judge generally evaluates fact based domestic relations issues more frequently than an appellate judge and a trial judge's day-to-day experience warrants deference upon

13

review." In re Parentage of Jannot, 149 Wn.2d 123, 127, 65 P.3d 664 (2003). When a trial court's findings of fact are partly supported by substantial evidence and partly not, we consider the extent to which the unchallenged and supported findings justify the trial court's legal conclusions. See Andren v. Dake, 14 Wn. App. 2d 296, 319, 472 P.3d 1013 (2020).

The trial court did not abuse its discretion when it granted sole decision-making to Cochener. Both Metcalfe and Cochener were opposed to mutual decision making. The trial court considered evidence and witness testimony presented over a multi-day trial, weighed that evidence, and arrived at findings of fact that are either unchallenged and accepted as true on appeal, or, as discussed above, supported by substantial evidence in the record. These findings provide a tenable basis for the trial court to conclude that Cochener is better suited to hold sole decision-making authority for L. and E.

The trial court did not err when it found such a change is in the best interest of the children and any harm is outweighed by the benefits. Metcalfe argues the harm to L. and E. is that Cochener will not adequately advocate for appropriate service levels from educational and health care providers. The trial court did not enter a finding that this is true, and it was entitled to find that any risk was counter-balanced by Cochener's lesser likelihood of alienating important provider relationships. In an unchallenged finding, the court stated, "Mother and Father cannot co-parent, which is especially troubling because the special needs of their children demand frequent decision-making and information sharing." In another unchallenged finding, the trial court stated, "The intensity of the co-parenting

14

dynamic is so extreme that multiple expert and lay witnesses testified the children are suffering. Their children have complained. The parents themselves agreed during trial they cannot make decisions together without intervention or support from intermediaries." These findings, together with the finding that Cochener has less deficit in the area of interpersonal communication, provide a tenable basis for the trial court to conclude it is in the best interests of the children that Cochener hold sole decision-making, and that any harm of such an arrangement is outweighed by the benefits. These findings also justified the ruling that Cochener may make all of the children's appointments, and may make major decisions 14 days after notifying Metcalfe.

III

Metcalfe asserts it was error for the trial court to place "great weight" on Dr. Wheeler's testimony, together with determining it would "not put great weight" on Dr. Marlowe's and Dr. Mandelkorn's opinions. Metcalfe argues the trial court erred by "rejecting the testimony of Dr. Marlowe and Dr. Mandelkorn and relying instead upon lay opinions," and challenges the finding that "Dr. Mandelkorn admitted he had very little contact with Cochener upon which to formulate his opinion." The experts' testimony provides support for the trial court's weighing of their opinions.

Metcalfe retained Dr. Marlowe as a litigation expert to conduct a records review and prepare a report. The evidence before the trial court was that Dr. Marlowe's only contacts were with Metcalfe and his attorneys, and she reviewed records that Metcalfe provided to her. Dr. Marlowe based her opinions of the children's academic performance on evaluations from 2019, and testified she did

not know where E.'s reading levels were at the time of the hearing. Nevertheless, Dr. Marlowe stated E. was not able to read at the time of the hearing, and that he would come out of Spruce Street School a nonreader. In contrast, both Cochener and the head of Spruce Street testified that at the time of trial, E. was a "voracious reader."

Metcalfe called Dr. Mandelkorn, eliciting testimony that Metcalfe was "pleasant to deal with," and that Metcalfe's e-mail communication "fell within the expectations of the issues [they] were dealing with." Dr. Mandelkorn had 14 appointments with L. Of those, Metcalfe attended "a preponderant number" and Cochener attended seven. Based on only these interactions with Cochener at L.'s appointments, in 2019, Dr. Mandelkorn stated in an e-mail to another provider that Cochener "[h]as significant mental health problems and is [in] complete denial of the issues." Dr. Mandelkorn testified he had no personal knowledge of Cochener's mental health.

Dr. Wheeler prepared a report by conducting 23.1 hours of interviews with the parents, parent-child observation sessions at both parents' homes, psychological assessments and questionnaires with both parents and both children, 12.3 hours of collateral interviews with medical and educational providers involved in the children's care, and reviewing records related to the case. Dr. Wheeler testified Dr. Mandelkorn "was clearly given the impression . . . that [Cochener] . . . suffered from . . . some kind of mental health disorder . . . and he was given that impression by Mr. Metcalfe. . . . [T]hat certainly is an example of . . . a provider being given an impression of her that . . . was inaccurate and

negative." Dr. Wheeler testified Dr. Marlowe was given mischaracterizations of Cochener, stating, "[S]he was given the impression that Ms. Cochener wasn't involved . . . as much as she is."

"The factfinder is given wide latitude in the weight to give expert opinion." In re Marriage of Sedlock, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993). The trial court placed lesser weight on Dr. Marlowe's testimony based on her having "had limited interactions with Mother and the children, and her opinion is based on the records provided by Father." While Cochener does not point to a particular omission in the records Metcalfe provided to Dr. Marlowe, the context of the trial court's weighing of her testimony was in contrast to Dr. Wheeler's evaluation, which the trial court stated was "extremely thorough, and includes hours of interviews with both parents, the children, and providers." Likewise, the trial court placed lesser weight on Dr. Mandelkorn's opinion, because he "had very little contact" with Cochener upon which to form his opinion.

Metcalfe nevertheless relies on In re Marriage of Leaver, 20 Wn. App. 2d 228, 499 P.3d 222 (2021) to argue the trial court abused its discretion in making these credibility determinations. There, in the context of spousal maintenance, a spouse presented expert testimony, which was not countered by any other expert, that his long-standing mental health conditions significantly impaired his ability to join the workforce and gain financial independence. Id. at 230. However, the trial court adopted the other spouse's lay opinion that he "could do more if he would just put his mind to it." Id. This court found this was an abuse of discretion and reversed. Id. at 231. We were careful to observe that the trial court was not

necessarily required to arrive at a particular ultimate decision concerning maintenance, even though it was required to base its decision on evidence that did not violate the prohibition on lay opinion testimony. Id. at 241. Leaver is distinguishable. First, in this case Dr. Marlowe's and Dr. Mandelkorn's testimony are contrasted by Dr. Wheeler's testimony, so it is not a case in which any one expert's views were without countervailing evidence. Second, the court did not admit lay opinion testimony and credit it over qualified expert testimony. In placing greater weight on Dr. Wheeler's testimony than on Dr. Marlowe's or Dr. Mandelkorn's, the trial court made an ordinary credibility determination, which we do not revisit on appeal. See In re Marriage of Rideout, 150 Wn.2d 337, 352, 77 P.3d 1174 (2003).

IV

Metcalfe argues he was subjected to federally-prohibited retaliation by Spruce Street School for "his advocacy on behalf of his children." The Disability Rights Education and Defense Fund (DREDF) submitted an amicus brief and presented oral argument. DREDF argues "the trial court displayed a troubling lack of consideration for father's right to advocate for his son. The trial court made no attempt to determine whether appellant's advocacy was protected activity before (mis)characterizing that advocacy as a defect in appellant's parenting." At oral argument, counsel for DREDF argued their complaint is that the trial court did not specifically mention that it was being careful not to hold advocacy against Metcalfe. Wash. Court of Appeals oral argument, In re Marriage of Cochener, No. 83271-9

18

(Jun. 15, 2023), at 2 min., 26 sec. to 2 min., 38 sec., https://tvw.org/video/division-1-court-of-appeals-2023061201/.

In its brief, DREDF cites cases in which third parties who had advocated for disabled students sued school districts for failure to meet federal requirements. For example, in North Kitsap School District v. K.W., 130 Wn. App. 347, 352-53, 123 P.3d 469 (2005), grandparents sued a school district for failing to provide a free appropriate public education to their grandchild under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-91. DREDF also cites a case holding that advocacy on behalf of disabled students is a protected activity under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203; 28 C.F.R. § 35.130(b). Barker v. Riverside County Office of Educ., 584 F.3d 821 (9th Cir. 2009). In Barker a teacher sued a county office of education, alleging retaliation after she filed a lawsuit on behalf of disabled students. Id. at 827. However, neither Metcalfe nor DREDF cites authority holding that any federal law imposes any substantive requirements on a state court deciding the issue of decision-making in a parenting plan according to state law. Regulations under the IDEA acknowledge that state courts may limit decision-making to one parent, providing that if "a judicial decree or order identifies a specific person or persons under paragraphs (a)(1) through (4) of this section to act as the 'parent' of a child or to make educational decisions on behalf of a child, then such person or persons shall be determined to be the 'parent' for purposes of this section." 34 C.F.R. § 300.30(b)(2). A federal court has rejected a parent's argument that her federal rights under IDEA could supersede a state court's authority to grant sole

19

educational decision-making to the other parent. Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 772 (2nd Cir. 2002). There, the court stated, "We decline plaintiff's invitation to federalize the law of domestic relations and hold that the IDEA . . . leave[s] intact a state's authority to determine who may make educational decisions on behalf of a child." Id. Another federal court applying the IDEA stated that "nothing in the IDEA overrides states' allocation of authority as part of a custody determination," and observed that the rights granted to parents in IDEA do not supersede state courts' authority. Navin v. Park Ridge Sch. Dist. 64, 270 F.3d 1147, 1149 (7th Cir. 2001).

We do not agree the trial court based its determination concerning decision-making on any actions by Metcalfe characterizable as advocacy protected by federal law. The trial court focused on the manner of Metcalfe's communications with the children's educational and health care providers, which the trial court found was deleterious to the children's relationship with key providers. The trial court did not rely on the content of Metcalfe's communications nor criticize at any point his right to seek appropriate care for his children. Its findings were that his communication style was interfering with the children's ability to receive the support they needed. Federal law contemplates, and Washington law directs, that in such circumstances a state court may appoint one parent as sole decision-maker. RCW 29.09.187; Taylor, 313 F.3d at 772. Metcalfe's and DREDF's argument that the trial court's decision ran afoul of any federal protections for students with disability is meritless.

V

During a break between witnesses, while discussing the fact that testimony had taken longer than expected, the trial court noted to Cochener's counsel, "I have noticed that with the professional witnesses . . . your budget for cross-examination has been a little under," and expressed concern that Dr. Wheeler's testimony the next day would take more than the planned time. Cochener's counsel stated, "[F]or the record . . . Dr. Marlowe was very defensive and . . . I think also nonresponsive . . . she used up more time than I think was necessary. . . . And with Dr. Mandelkorn, there were a lot of objections that increased my time." After some additional discussion, the trial court stated, "[I]t's a trend and . . . I shouldn't say it's a trend with . . . all the professional witnesses. I think it's just . . . happens to be with doctors that this has happened. . . . [A]nd doctors are notoriously terrible witnesses, so I can appreciate."

Metcalfe argues this stated an opinion that doctors are "terrible witnesses" and worked to his disadvantage because he relied on Dr. Mandelkorn and Dr. Marlowe. Cochener counters that "[t]aken in context, the trial court was merely commenting on the length of time that [Cochener]'s cross-examination of both Drs. Mandelkorn and Marlowe was taking." Further, quoting the trial court's findings of fact, Cochener argues, "The trial court was clearly not biased against 'doctors' . . . because it 'placed great weight on [Dr. Wheeler's] testimony.' " The trial court's statement cannot fairly be construed either as a statement about the value of testimony by doctors or as bias. We find no error, and even if we did, any error in this isolated comment would be harmless. See State v. Gonzales, 90 Wn. App.

852, 855, 954 P.2d 360 (1998) (a harmless error is one "which is trivial, formal, or merely academic and which in no way affects the outcome of the case.").

VI

During Dr. Marlowe's testimony, the trial court asked, "[Y]ou are aware, of course, that the Seattle Public Schools have been sued any number of times for not providing meaningful education to children, right? . . . I'm just curious . . . in general we've all had the experience, I think it's common sense that Seattle Public Schools does not have a stellar reputation for providing . . . specially designed education services for children. So why do you think that they would do that for [E.] when they haven't done it for so many children?" Dr. Marlowe responded, "Well, they did a good job in [L.'s] IEP." She went on "[a]nd I know that they really care about kids and . . . I have seen . . . the services that they've provided for kids."

Metcalfe portrays this as an injection by the trial court of its own impression of events outside of the evidence. Metcalfe cites Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). Liteky states,

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

Id.

22

Even if the court's comments were read as revealing an opinion from an extrajudicial source, they do not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Id. The main issue was not whether Spruce Street School or Seattle Public Schools would be a better fit for E. Moreover, at the time of trial, L. was attending a Seattle public school. At no time did the trial court question L.'s placement in Seattle Public Schools, and nothing in the trial court's final oral ruling or written orders suggests that its determination about decision-making was based on an expectation about whether the children would attend Seattle Public Schools, let alone an opinion by the court about the appropriateness of their doing so. Further, even if the comment was error, any error would be harmless in view of the evidence and issues in the case.

VII

Metcalfe challenges a provision of the parenting plan that reads in part: "No parent will put down Christianity to or in front of the children, or allow other members of their household to put down either parents' spirituality." Metcalfe argues the trial court's wording of the religious upbringing provision violates the First Amendment.

The provision was not discussed until a posttrial hearing. Cochener's counsel stated, "Ms. Cochener just wants to be sure that Mr. Metcalfe does not have the ability to block her from teaching the children about her religion." The Court inquired as to the parents' religious practices. Cochener identified herself as "a practicing Christian," and Metcalfe stated, "I don't identify with any particular religion." Metcalfe stated it would not be a problem for him to teach the children to

23

respect Cochener's religion, and "I think we should both expose the kids to different things so they can find their own way in life and be respectful to the other's views." Cochener stated, "[M]y only concern is that my children have expressed that they have been told denigrating things about Christianity in their dad's house. . . . I have no concern about raising my children with a respect for all religions and beliefs and non-beliefs." The Court responded, "So any negative comments about Christianity made to the children or in front of the children . . . will be adequate cause to change the position to sole decision-making." The trial court subsequently incorporated Metcalfe's and Cochener's agreements in the written order: "Parents have agreed to raise their children to affirm all religious traditions, appreciate the good in the practice of other faiths, and respect those who have no religious preference. No parent will put down Christianity to or in front of the children, or allow other members of their household to put down either parents' spirituality."

Parents have a fundamental right to make decisions regarding the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The parental right to determine the child's religious upbringing derives both from the parents' right to the free exercise of religion and to the care and custody of their children. See Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion" in reference to universal compulsory education), overruled on other grounds by Emp't Division v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). A parent's right to direct the religious upbringing

24

of a child may be subject to limitation "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." Id. at 233-34. Article 1, section 11 of the Washington State constitution is more protective of religious freedom than the First Amendment. In re Marriage of Jensen-Branch, 78 Wn. App. 482, 491, 899 P.2d 803 (1995). A Washington court may restrict a parent from teaching children about faith "only upon a substantial showing of potential or actual harm to the children as a result of the children's adverse reaction to parental conflict over the children's religious upbringing, and only to the degree necessary to prevent harm to the children." Id. at 483.

Elsewhere, Massachusetts upheld a prohibition that a parent "shall not share his religious beliefs with the children if those beliefs cause the children significant emotional distress or worry about their mother or about themselves." Kendall v. Kendall, 426 Mass. 238, 241, 250, 687 N.E.2d 1228 (1997). A Colorado court reversed a prohibition on homophobic religious teachings when the court could not "determine from the findings whether the trial court applied the correct standard in limiting [a parent's] right to determine the child's religious upbringing. In re Interest of E.L.M.C., 100 P.3d 546, 564 (Colo. App. 2004). There, though the other parent argued the restriction was a mere nondisparagement clause, the court did not uphold it on that basis "because it is not so described in the trial court's order. Nor is it mutual." Id.

As written, the challenged provision limits religious topics the parents may discuss with the children in potentially undefined and subjective ways, and is not

specific to nondisparagement of the respective parents' spirituality. The record does not show the trial court analyzed whether parental decisions on religious discussions will jeopardize the health or safety of the children. The parties agreed at oral argument that their dispute is adequately resolved as long as the parenting plan provides that neither parent shall disparage the other parent's spirituality. Wash. Court of Appeals oral argument, Cochener, No. 83271-9 (Jun. 15, 2023), at 2 min., 26 sec. to 2 min. (Cochener's Counsel) and at 21 min. 12 sec. to 21 min. 18 sec. (Metcalfe's Counsel), https://tvw.org/video/division-1-court-of-appeals-2023061201/. Such a provision would be consistent with orders concerning religious upbringing that have been upheld. We reverse the religious upbringing provision, and remand for the religious decision-making provision to be revised to reflect the parties' agreement that mutual nondisparagement of each parent's spirituality is sufficient.

We otherwise affirm. We do not reach Cochener's cross appeal. We remand on the issue of religious decision-making only.

_Birk, J._

WE CONCUR:

_Chung, J._ _Dwyer, J._

26